IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SANDRA M. PORTER,<br><br>Plaintiff,<br><br>v.<br><br>ELK REMODELING, INC.,<br><br>Defendant. | Civil Action No.: 1:09-cv-446 |

## Memorandum Opinion

Before the Court is Defendant Elk Remodeling, Inc.'s Motion for Summary Judgment (Dkt. No. 55). Upon review of the pleadings filed by the parties, the Court finds that as to Counts III (violation of Section 510 of ERISA) and IV (violation of the VHRA) of the Amended Complaint there are remaining issues of fact that must be decided by a jury, and thus the motion for summary judgment is DENIED. However, as to Count V (common law wrongful discharge), the Court finds that the claim is preempted by federal law, and thus summary judgment is GRANTED.

## BACKGROUND

Plaintiff Sandra M. Porter is a female who was a full-time employee with Elk Remodeling, Inc. ("Elk") from March 16, 2004, until her termination on April 27, 2007. First Amended Complaint ("Am. Comp.") ¶ 13. Plaintiff managed Elk's QuickBooks accounting software and was Elk's Executive Administrative Assistant until March 19, 2007 when she was promoted to General Manager and received a 20 percent increase in salary. Exhibit 1-A to Plaintiff's Response in Opposition ("PEX"); Exhibit A to Defendant's Motion for Summary Judgment ("DEX") at 130.

1

Up until shortly before her termination, Plaintiff was the only female employed by Elk. DEX A. During calendar years 2006 and 2007, Elk employed between five and twelve persons, as recorded during its semi-monthly pay periods. DEX G. Elk is managed by its President and sole shareholder, Timothy Shellnutt ("Shellnutt"). PEX 3, Defendant's Response to Interrogatory ("D. Res. Int.") No. 15.

Starting in 2005, Elk began reimbursing Plaintiff for her premium payments for her individual health insurance policy. DEX A. She was the only Elk employee to receive this benefit up until the date of her termination. *Id.* At all times relevant, Plaintiff was a single mother, and had been diagnosed with Celiac disease. *Id.* Plaintiff was told by Shellnutt to record premium reimbursements as a general expense on the company's expense sheet. *Id.*

In March 2007, Elk began looking into providing group healthcare coverage for its employees. Am. Comp. ¶ 21. Plaintiff asserts that other Elk employees were distributed health insurance applications while she was not. PEX 1, ¶ 6. Plaintiff was suspicious that Elk intended to deprive her of the group healthcare plan, and so she carried a microcassette tape recorder with her during March and April 2007 in order to record her conversations with Shellnutt. *Id.* at ¶ 8; DEX A.

Plaintiff alleges that at some point around this time she overheard Shellnutt having a phone conversation during which he referred to someone – Plaintiff believes it was herself – as a "breeder." Am. Comp. ¶ 20. Plaintiff could not confirm with whom Shellnutt was speaking or that the comment was directed towards her. DEX A. Plaintiff claims that Shellnutt laughed and said, "She's going to be expensive. She's a breeder." *Id.*

In early April 2007, Elk applied for group healthcare coverage with CareFirst BlueCross BlueShield ("CareFirst"). Elk submitted a Group Contract Application to CareFirst for a policy

2

that would cover Shellnutt and his family, plus two full-time Elk employees, both male.[1] PEX 2-A. CareFirst approved the application on April 18, 2007, and Shellnutt wrote a check to the insurer in the amount of $1,569.00 on that same day. *Id.*

Plaintiff alleges that on April 18, 2007, Shellnutt's wife, Claudia Shellnutt, called her and faxed over a "Waiver of Enrollment Form," asking Plaintiff to sign it to reflect that she was declining the group healthcare plan. PEX. 1, ¶ 6; Porter Deposition ("Porter Dep.") at 84-85. Elk denies the accusation and argues that Plaintiff was impermissibly trying to receive double healthcare benefits (*i.e.* both the group healthcare plan and reimbursement for her premiums). PEX 3, D. Res. Int. No. 3.

On April 19, 2007, Elk faxed a listing of its employees to CareFirst, representing to the insurer that it had three full-time employees and that Plaintiff had been terminated. PEX 2-A. An invoice sent by CareFirst to Elk on April 25, 2007 confirmed group coverage for Shellnutt and his family, plus the two single employees, due to take effect on May 1, 2007. *Id.*

On April 27, 2007, Plaintiff confronted Shellnutt in his office about the healthcare plan. Plaintiff secretly recorded the conversation on her microcassette recorder. DEX C. Shellnutt told Plaintiff that it would cost Elk $3900 to insure her on the group policy immediately. *Id.* He said, however, that if she signed the waiver, he could add her to the group policy in two months and the total cost to Elk would only be $1800. *Id.* Shellnutt stated that in the meantime Elk would continue reimbursing her premiums for her individual coverage. *Id.*

Plaintiff wanted to know why it would cost so much more to add her initially. Shellnutt replied that he did not know but speculated that it might be because Plaintiff was a female, had a child, and could get pregnant, while the other employees to be covered under the group plan were single and childless. *Id.* Plaintiff said she would not sign anything, to which Shellnutt

---
[1] The application clearly bears Shellnutt's signature which is dated early April 2007.

replied that he was not going to get the insurance for anyone then, and that he was not going to continue reimbursing Plaintiff for her premiums either. *Id.* Shellnutt eventually stated, "I think what we really should do is we should talk about maybe getting a new job because I don't think this is working out between the two of us." *Id.* Plaintiff requested written notice of her termination, and received it later that day. *Id.*

The termination notice written by Shellnutt cited the company's poor financial state and need to make immediate cut-backs, adding that he would be more than happy to recommend Plaintiff to other potential employers. PEX 1-H. Subsequently, in a letter dated June 25, 2007, Shellnutt "highly recommended Ms. Sandy Porter for any executive position within your company." PEX 1-G. During the course of this litigation, Shellnutt has alleged that Plaintiff started having a bad attitude in the workplace in April 2007, and it adversely affected Elk and its relations with clients and vendors. PEX 3, D. Res. Int. No. 5. Thus, he claims that in conjunction with Elk's need to make further cutbacks, letting go of Ms. Porter was necessary. *Id.*

## PROCEDURAL HISTORY

On April 27, 2007, Plaintiff was formally terminated from her employment. Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) on October 24, 2007, which was cross-filed with the Virginia Council on Human Rights and amended on March 27, 2009. Defendant submitted a position statement to the EEOC on December 11, 2007. Plaintiff received a notice of right to sue from the EEOC dated July 8, 2009.

Plaintiff's timely filed First Amended Complaint, dated August 10, 2009, alleged the following five counts against defendants Elk Remodeling, Inc., Timothy Shellnutt, and Claudia

Shellnutt:[2] (1) discrimination on the basis of gender in violation of Title VII; (2) retaliation in violation of Title VII; (3) interference with attaining rights provided by an ERISA-defined plan in violation of section 510 of ERISA, 29 U.S.C. § 1140; (4) gender discrimination and retaliation in violation of the Virginia Human Rights Act ("VHRA"), Va. Code Ann. § 2.2-2639; and (5) common law wrongful discharge. Defendant filed its Answer of All Defendants on September 16, 2009.

After the close of discovery, Defendant filed its Motion for Summary Judgment as to all five counts on May 21, 2010. Plaintiff filed her Memorandum in Opposition on June 1, 2010, and voluntarily dismissed Counts 1 and 2.[3] After review of the record, the Court now issues this opinion.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has held that Rule 56(c) mandates the entry of summary judgment, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party must then go beyond the pleadings and mere allegations to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 323. The mere existence of some alleged factual dispute between the parties will not defeat an

---

[2] Defendants Timothy and Claudia Shellnutt filed for bankruptcy on March 5, 2010. The case against them has been stayed pending resolution of the bankruptcy proceedings.
[3] As Plaintiff has voluntarily withdrawn Counts 1 and 2, the Court will not address these claims.

5

otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## DISCUSSION

### Count III – violation of 29 U.S.C. § 1140 (Section 510 of ERISA)

Plaintiff alleges in her Complaint that Defendant violated section 510, 29 U.S.C. § 1140, of the Employee Retirement Income Security Act ("ERISA") when Defendant terminated her on April 27, 2007. Section 510 of the ERISA states:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

Section 502, 29 U.S.C. § 1140, is the enforcement provision of ERISA and states, in relevant part:

> A civil action may be brought –
> (1) by a participant or beneficiary –
>> (A) for the relief provided in subsection (c) of this section, or
>> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights under the terms of the plan;
>> . . . .
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

Defendant argues in its motion for summary judgment that there was no employee benefit plan in existence at the time Plaintiff was fired, and therefore Defendant cannot be liable for interfering with Plaintiff's attainment of such plan. The statute defines an employee benefit plan

6

as either an "employee pension plan" or an "employee welfare plan." 29 U.S.C. § 1002(3). An employee welfare plan is defined as follows:

> [A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness . . . .

29 U.S.C. § 1002(1). Courts have broken down this statutory definition into five distinct elements: 1) a plan, fund, or program; 2) established or maintained; 3) by an employer; 4) for the purpose of providing medical, surgical, hospital care, [or] sickness . . . benefits; 5) to participants or their beneficiaries. *Madonia v. Blue Cross & Blue Shield of Virginia*, 11 F.3d 444, 446 (4th Cir. 1993) (internal quotation marks and citation omitted). The parties do not appear to dispute the existence of elements 1, 3, and 4; however, Defendant vehemently disputes that the plan had been "established" on the date that Plaintiff was fired, and also appears to dispute that Plaintiff was a "participant" within the meaning of the statute.

The Fourth Circuit has adopted the holdings of other circuits which find that "payment of premiums on behalf of . . . . employees is 'substantial evidence that a plan, fund, or program (was established).'" *Madonia*, 11 F.3d at 447 (citing *Kidder v. H&B Marine, Inc.*, 932 F.2d 347, 353 (5th Cir. 1991) (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982))). In *Donovan*, the Eleventh Circuit laid out the analysis for determining whether a plan has been established, stating:

> A decision to extend benefits is not the establishment of a plan or program. Acts or events that record, exemplify or implement the decision will be direct or circumstantial evidence that the decision has become a reality – e.g. financing or arranging to finance or fund the intended benefits, establishing a procedure for disbursing benefits, assuring employees that the plan or program exists – but it is the

> reality of a plan, fund or program and not the decision to extend
> certain benefits that is determinative.

688 F.2d at 1373; *see Moor v. Life Insurance Co. of N. Am.*, 2010 WL 1254679 (N.D.W.Va. March 25, 2010) (quoting this language of *Donovan*). Similarly, in *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207 (11th Cir. 1999), the Eleventh Circuit held that "a plan has been established when there has been some degree of implementation by the employer going beyond the mere intent to confer a benefit." *Id.* at 1214. The court in *Butero* found that the plan at issue had been established where the employer consulted an insurance agent, selected the terms of the group policy it wished to purchase for its employees, completed an application form for the policy, solicited enrollments from its employees, collected money through payroll deductions, and remitted premium checks. *Id.*

In this case, the actions which Shellnutt took to apply for and implement the healthcare plan with CareFirst are sufficient for the Court to find that the plan was established within the meaning of section 510. The documents submitted by Plaintiff which were received via subpoena to CareFirst clearly demonstrate that Shellnutt had filled out and signed an application for coverage, submitted payroll reports to establish which employees would be covered, and begun to remit premium payments, all before Plaintiff was fired on April 27, 2007. These actions taken as a whole demonstrate to the Court that the plan had been established before Plaintiff's employment was terminated.

Further, the Court finds that Plaintiff was a participant within the meaning of the statute. A participant is defined as follows:

> [A]ny employee or former employee of an employer, or any member
> of former member of an employee organization, who is or may
> become eligible to receive a benefit of any type from an employee
> benefit plan which covers employees of such employer or members of

8

such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7). The issue of whether Plaintiff has standing as a participant with the meaning of the statute turns on whether she "may have become eligible" for an ERISA benefit. An employee may become eligible for benefits if she has a "colorable claim that (1) she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Cora Smith v. Bernard Logan*, 363 F. Supp. 2d 804, 809 (E.D. Va. 2004) (finding that plaintiff whose retirement became effective three days before eligibility for the plan began was a participant within the meaning of section 502(a)).

In this case, Plaintiff was fired before the CareFirst plan actually took effect, and therefore she never received any benefits from the plan. However, because all full-time employees were eligible for the plan, and Plaintiff was a full-time employee, she would have been eligible for the plan had she not been terminated. As such, Plaintiff is a participant within the meaning of section 510.

In order to find Elk liable for violating 29 U.S.C. § 1140, Plaintiff must prove that her employer was at least in part motivated by a specific intent to interfere with her attainment of rights under the plan. *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 239 (4th Cir. 1991). The Fourth Circuit has adopted the *McDonnell-Douglas* burden shifting framework in analyzing the issue of an employer's discriminatory intent. *Id.* Under this framework the plaintiff must first establish a *prima facie* case of discrimination. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). If the plaintiff can establish a *prima facie* case of discrimination, then the employer must present a legitimate, non-discriminatory reason for the firing. *Id.* The burden then shifts back to the plaintiff to demonstrate that the employer's proffered reasons are pretextual or the plaintiff's claim will fail. *Id.*

The Court finds that Plaintiff has demonstrated that a genuine issue of fact exists on the matter of pre-text. Plaintiff has presented evidence to the Court that she was fired because she refused to sign a waiver of health insurance, *i.e.* that she was fired to prevent her from obtaining benefits under the health insurance plan. While Defendant asserts that Plaintiff was terminated because of her bad attitude, the tape recordings of the conversation that took place between Plaintiff and Shellnutt on April 27, 2007 establish a genuine issue about whether the "bad attitude" basis for termination was pre-textual. In the April 27 conversation, Shellnutt bluntly discusses with Plaintiff the additional insurance premiums which the company will have to pay if Plaintiff is covered under the plan. When Plaintiff makes clear that she will not sign the waiver, Shellnutt terminates her employment. The Court finds that this evidence is sufficient to create a genuine issue of fact as to the motivation behind Plaintiff's termination. As such, Defendant's motion for summary judgment as to section 510 is DENIED.

## **State Law Claims**

### Preemption

Defendant argues that should summary judgment as to the ERISA claim be denied both of Plaintiff's state law claims are preempted by ERISA and thus should be dismissed on that ground. In order to address the issue of preemption, the Court must first distinguish between ordinary preemption (also known as "conflict preemption") and "complete preemption." Complete preemption is a jurisdictional doctrine which refers to the "small category of statutes that . . . 'authorize removal of actions that sought relief only under state law.'" *Lontz v. Tharp*, 413 F.3d 435, 438 (4th Cir. 2005) (internal citation omitted). In contrast, ordinary or conflict preemption is insufficient to provide a basis for removal to federal court. *Darcangelo v. Verizon*

10

*Communications, Inc.*, 292 F.3d 181, 186-187 (4th Cir. 2002). Instead, when a state law conflicts with a federal law, ordinary conflict preemption may be asserted as a federal defense to the plaintiff's suit. *Id.*

ERISA contains an express preemption provision, section 514, which states that ERISA supersedes all state laws insofar as they "relate to" an ERISA plan. 29 U.S.C. § 1144. Upon analyzing the objectives of ERISA, the Supreme Court has explained that Congress intended to preempt at least three categories of state law under section 514: (1) laws that mandate employee benefit structures or their administration, (2) laws that bind employers or plan administrators to particular choices or preclude uniform administration practices, and (3) laws that provide alternative enforcement mechanisms to ERISA's civil enforcement provisions. *Darcengelo*, 292 F.3d at 190 (citing *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658-59 (1995)). These three preemption categories are thus a guide for determining whether a particular state law relates to an ERISA plan. *Darcangelo*, 292 F.3d at 190.

We now consider whether Plaintiff's two state law claims are based on Virginia causes of action that fall under one of the three preemption categories set forth above.[4] Plaintiff asserts one claim for discrimination in violation of the Virginia Human Rights Act ("VHRA") and one common law wrongful termination claim. Clearly neither of these state law claims falls under preemption category 1 or 2. The remaining question then is whether either of the claims seeks relief under state laws that provide alternative enforcement mechanisms for claims that are actually ERISA claims. *Id.* at 191. The Court will consider a state claim to be an alternative enforcement mechanism for ERISA rights "if the state claim could be brought as an enforcement

---

[4] In this case because the question is not one of removal, the Court need not reach the question of complete preemption; instead, the Court need only answer whether the state law claims asserted by Plaintiff can proceed as independent causes of action or whether they are preempted and therefore must be dismissed.

action under [section] 502." *Id.*

### Count IV – Violation of the VHRA

In Count IV of the Amended Complaint Plaintiff appears to assert claims for violation of the VHRA based on retaliatory discharge, discharge based on gender, and denial of health insurance benefits based on gender.

As discussed above, Defendant argues that Plaintiff's claim under the VHRA should be dismissed as preempted by ERISA. The Court, however, does not find this argument convincing. The VHRA does not provide an alternative enforcement mechanism for an action under section 502 of ERISA as there is no cause of action for termination, or other discrimination, based on gender under ERISA. Instead, Plaintiff's VHRA claim is an ordinary state-law tort action which does not implicate the enforcement provision of ERISA, and therefore does not relate to an ERISA plan as required under section 514. As such, Plaintiff's VHRA claim is not preempted by ERISA.

The Court must next determine whether the allegations by Plaintiff present a cognizable claim for relief under the VHRA such that they can survive Defendant's motion for summary judgment. The VHRA declares that it is the policy of the Commonwealth of Virginia to safeguard all individuals from, among other things, discrimination based on gender. Va. Code Ann. § 2.2-3900(B)(1). However, it does not create a private right of action except under limited conditions set forth in section 2.2-2639(B) and (C) of the Virginia Code. Section 2.2-2639(B) provides that no employer employing more than five but less than 15 persons "shall discharge any such employee on the basis of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, including lactation, or of age if the employee is 40 years

old or older."

In this case, Plaintiff alleges claims for denial of health insurance and for retaliatory discharge, which do not fall under the limited category of actions set forth in section 2.2-2639(B) and (C) of the Virginia Code. Therefore, even if the statute appears to support a public policy regarding those issues, the VHRA does not provide a private cause of action for such claims. *See Wynne v. Birach*, 2009 WL 3672119 at *2 (E.D. Va. Nov. 3, 2009); *Doss v. Jamco, Inc.*, 254 Va. 362, 371-72 (1997). As such, these claims must fail as a matter of law. The only cognizable VHRA claim asserted by Plaintiff is for termination based on gender discrimination.

In support of her claim for discrimination based on gender, Plaintiff submitted tape recordings of the conversation which took place on April 27, 2007 between Plaintiff and Shellnutt. During the conversation Shellnutt makes reference to Plaintiff being a female, having a child, and potentially bearing more children in the future as reasons why health insurance premiums might be higher if she were covered under the plan. Plaintiff has also presented evidence that the only employees who became covered under the health insurance plan were men. Additionally, Plaintiff stated under oath in her deposition that she overheard Shellnutt refer to someone, whom she believed to be herself, as a "breeder," implicating her status as a woman and someone who bears children. As such, the Court finds that Plaintiff has presented sufficient evidence such that a reasonable jury could find that Plaintiff was terminated because of her gender in violation of the Va. Code § 2.2-2639.

Because the Court finds that there are issues of fact to be decided by a jury and because Plaintiff's claim for unlawful termination based on gender is not preempted by federal law, Defendant's motion for summary judgment as to Plaintiff's claim under the VHRA is DENIED.[5]

---

[5] The only remaining claim within Count IV is that for discriminatory termination based on gender.

13

Count V – Common Law Wrongful Discharge

Virginia strongly adheres to the employment-at-will doctrine, but with certain narrow exceptions to "temper its harsh application". *Bowman v. State Bank of Keysville*, 229 Va. 534, 540 (1985); *see also Lockhart v. Commonwealth Educ. Sys. Corp.*, 247 Va. 98, 102 (1994); *Miller v. SEVAMP, Inc.*, 234 Va. 462, 468 (1987). An employee has a cause of action in tort when her discharge is the result of employer conduct that violates Virginia public policy. *Bowman*, 229 Va. at 540. A statute may either explicitly state, or embody as a necessary corollary, a public policy goal. *Mitchem v. Counts*, 259 Va. 179, 189 (2000). "Laws that do not expressly state a public policy, but were enacted to protect the property rights, personal freedoms, health, safety, or welfare of the general public, may support a wrongful discharge claim if they further an underlying, established public policy that is violated by the discharge from employment."[6] *Id.*

In the case at bar, Plaintiff's wrongful discharge claim is based upon the public policy reflected in Va. Code § 38.2-508, which limits discrimination in the allotment, price, and benefits of certain types of insurance policies based on criteria deemed unfair. The underlying substance of Plaintiff's state common law claim is that she was terminated because she would not agree to Defendant's discriminatory denial of benefits under the healthcare plan. Plaintiff argues that this discriminatory conduct is in violation of Virginia public policy as set forth in Va. Code § 38.2-508. These allegations of termination based on interference with Plaintiff's ability to obtain rights under the healthcare plan are exactly what Plaintiff is asserting in her ERISA claim. Because Plaintiff could bring this state law claim as an enforcement action under section 502, it relates to an ERISA plan under section 514 and is preempted. *See Darcangelo*, 292 F.3d

---

[6] In finding Plaintiff's common law cause of action preempted by ERISA, the Court need not reach the issue of whether Plaintiff has presented a wrongful discharge claim that would survive summary judgment in the absence of federal preemption.

14

at 191. As such, Defendant's motion for summary judgment as to Count V is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED in part and DENIED in part. To the extent Defendant's motion seeks dismissal of Count V of the Amended Complaint, the motion is GRANTED. To the extent Defendant's motion seeks dismissal of Counts III and IV, the motion is DENIED.

Alexandria, Virginia
June 9, 2010

/s/
Liam O'Grady
United States District Judge