

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SANDRA M. PORTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 1:09-cv-446 |
| ) | |
| ELK REMODELING, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

### Background

Ms. Porter, brought this action to recover damages from Defendant Elk for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII") (Counts I and II); for interference with protected rights in violation of Section 510 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (Count III); for discrimination in violation of the Virginia Human Rights Act ("VHRA") (Count IV); and for wrongful termination in violation of Virginia's public policy (Count V).[1] This Court possesses jurisdiction over all claims pursuant to 28 U.S.C. §§ 1331, 29 U.S.C. §§ 1132(a), (f) and 1140, 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. § 1367.

The Court previously entered summary judgment against Porter as to all claims other than Count III (ERISA Section 510 claim) and Count IV (VHRA claim) to the extent that claim raised a claim for intentional sex discrimination arising from Ms. Porter's discharge. *See* Doc.

---

[1] Ms. Porter brought her complaint against individual defendants Timothy M. Shellnutt and Claudia Shellnutt as well (Doc. 2), but both filed for bankruptcy on March 5, 2010. *See* Doc. 30 (notice of bankruptcy filing for Case No. 10-11620-RGM (Bankr. E.D. Va.)). This case was stayed as against them individually, though Tim Shellnutt was the President and shareholder of Elk and carried out employment policies and practices for Elk. *See* Doc. 2.

1

74-75. Specifically, Porter withdrew Counts I and II (Title VII claims) and Count V (public policy claim) was found preempted by ERISA. *Id.*

At a hearing on Friday, June 11, 2010, this Court ordered that Defendant Elk pay Plaintiff Porter's attorney's fees and costs associated with having to prove the truth of statements that Defendant Elk previously denied in discovery but subsequently admitted were true as part of its briefing in summary judgment. *See* Doc. 77. Subsequent to that hearing, Defendant conceded liability and agreed to entry of judgment as to liability against it and in favor of Plaintiff on Counts III and IV. *See* Doc. 78-80. As part of their joint motion for entry of judgment as to liability, the parties agreed: 1) that the trial scheduled for June 14, 2010, would be a bench trial; 2) Defendant consented to the introduction of any evidence listed in either party's prior-filed exhibit list that Plaintiff wished to designate for the record; and 3) Defendant admitted the facts as stated in the First Amended Complaint and Demand for Jury Trial ("Complaint"), including this Court finding that Ms. Porter has proved that (a) a group health insurance plan governed by ERISA had been established or maintained by Defendant at the time of her termination and (b) that Defendant unlawfully discharged and discriminated against Plaintiff with the specific intent to harm her and interfere with her attainment of any rights to which she may have become entitled under the plan. *See id.*[2]

On June 14, 2010, the Court heard testimony and accepted exhibits into the record.

**Findings of Fact**

<u>The Parties</u>

---

[2] The Court was informed by counsel for Defendant Elk during a telephone conference on Friday, June 11, 2010, that Defendant Elk, after being advised by its lawyer that failing to appear could be detrimental to its interests, would chose not to be present at the trial on June 14, 2010. Defendant Elk and its counsel were not present at the trial on June 14, 2010.

2

1. Sandra M. "Sandy" Porter was employed by Defendant Elk Remodeling, Inc. from March 16, 2004, until her termination on April 27, 2007. (Doc. 2, ¶13; Doc. 81).

2. Defendant Elk Remodeling, Inc. is, and at all times hereinafter mentioned was, a corporation with its principal offices and principal place of business in Fairfax, Virginia, within the jurisdiction of this Court, where it has been engaged in providing home improvement services in the Northern Virginia area. (Doc. 2 ¶6; Doc. 81).

3. Defendant Timothy "Tim" D. Shellnutt is the President of Elk Remodeling, Inc. Defendant Tim Shellnutt is married to Defendant Claudia Shellnutt. Defendant Tim Shellnutt carried out employment policies and practices for Elk Remodeling. (Doc. 2, ¶7; Doc. 81).

4. Claudia Shellnutt participated in events leading to Ms. Porter's termination. (Doc. 2, ¶8; Doc. 81).

5. Mr. Shellnutt and Ms. Shellnutt are the alter ego of Elk Remodeling, Inc. By way of example, Mr. Shellnutt would use corporate funds for his hunting club, though he would instruct that the expenses must be booked as "dumping fees" on the corporate books. (Doc. 2, ¶9; Doc. 81).

Ms. Porter's Employment at Elk Remodeling, Inc. and Termination

6. Ms. Porter received positive reviews and raises in pay throughout her employment with Defendant Elk, (Doc. 2, ¶14; Doc. 81), including being provided 10 days of paid vacation in 2004, a 10% pay raise in 2005, and a promotion from administrative assistant to General Manager in 2006. (Trial testimony of Porter 6/14/10; Plaintiff's Exs. 4-6).

7. During her employment with Elk Remodeling, Inc., Ms. Porter obtained health insurance coverage for herself, and Elk Remodeling, Inc. agreed to reimburse Ms. Porter for

3

premiums associated with that individual health insurance policy. (Doc. 2, ¶15; Doc. 81; Trial testimony of Porter 6/14/10).

8. Elk Remodeling, Inc. did not provide health insurance to all its employees prior to 2007, primarily due to the fact that Timothy Shellnutt was covered under a health insurance policy that Claudia Shellnutt participated in via her employment with another company, Marshall Insurance. (Doc. 2, ¶16; Doc. 81; Plaintiff's Ex. 19 (Rule 30(b)(6) deposition of Stynchula Herbert & Associates)).

9. On March 19, 2007, Ms. Porter received a pay raise to $50,160.00 per year as a result of her earlier promotion to General Manager. (Doc. 2, ¶17; Doc. 81; Trial testimony of Porter 6/14/10 and Plaintiff's Ex. 6).

10. Around March 2007, Defendants decided to provide health insurance benefits to employees of Elk Remodeling, Inc., primarily due to the fact that Claudia Shellnutt was no longer working for her prior employer, and her health benefits (which also covered Mr. Shellnutt) were going to end. (Doc. 2, ¶18; Doc. 81; Trial testimony of Porter 6/14/10).

11. In or about March and April 2007, Defendants were pursuing CareFirst BlueCross BlueShield to provide group health insurance benefits to employees of Elk Remodeling, Inc. (*See* Doc. 2, ¶18; Doc. 81; Trial testimony of Porter 6/14/10).

12. In or around March and April 2007, Ms. Porter was not offered the same insurance coverage as the male employees who were to be provided coverage, and she was not provided an application for insurance that were provided to the male employees of Defendant Elk. (Doc. 2, ¶18; Doc. 81; Trial testimony of Porter 6/14/10).

13. Ms. Porter was the only full-time female employee of Elk Remodeling, Inc. at the time the decision was made to provide health insurance benefits to its employees. (*See* Doc. 2, ¶19; Doc. 81; Trial testimony of Porter 6/14/10).

14. At one point during her employment, Mr. Shellnutt referred to Ms. Porter as a "breeder," referring to her ability to have children. (Doc. 2, ¶20; Doc. 81).

15. As a result of not being provided a health insurance form and due to her concerns of discrimination, Ms. Porter contacted a friend who was in human resources at another company and who advised Ms. Porter that in Virginia Ms. Porter would be within her rights to tape record conversations in which she participated. (*See* Trial testimony of Porter 6/14/10).

16. Ms. Porter began taping conversations at work in which she was a participant and in which the subject of health insurance benefits was discussed. (Trial testimony of Porter 6/14/10).

17. Defendant Elk used an insurance broker, Stynchula Herbert & Associates, to assist it to obtain the group health insurance benefits for Defendant Elk's employees in the spring of 2007. Plaintiff's Ex. 19 (Rule 30(b)(6) deposition of Stynchula Herbert & Associates at pp. 5-12).

18. On April 10, 2010, Defendant Elk submitted a master group contract application to its broker, who then submitted it to BlueCross BlueShield. *See* Plaintiff's Ex. 19 (Rule 30(b)(6) deposition of Stynchula Herbert & Associates at pp.7-12) and excerpts of Ex. B to that deposition marked by witness with "MGA" and "Rate Sheet" and "IEA" showing fax header of April 10, 2007 from Elk Remodeling, Inc.); Plaintiff's Ex. 27 (BlueCross BlueShield documents including master group contract for Defendant Elk showing fax header from Stynchula, Herbert & Associates).

19. A wage and tax report (in this case also known as VEC report) also must accompany every group application to prove that those who are applying are actually employees of the company requesting insurance because insurance carriers will not cover individuals who are not employees of the company seeking insurance. *See* Plaintiff's Ex. 19 at pp.8-10; 34-35. Defendant Elk did not send its wage and tax report with the other application materials when it submitted them on April 10, 2007. *See id.* at 36-41 and Ex. B.

20. Defendant Elk's insurance broker also testified that an employer has an obligation under federal laws, if it chooses to provide group health insurance to its employees, to cover all full-time employees that are designated as eligible by the employer, and that Defendant Elk classified all active full-time employees as eligible. *Id.* at 52-54.

21. The wage and tax report also is used, along with a waiver of enrollment form, to ensure a fiduciary of a group health insurance plan abides by the law in covering all eligible employees of the employer and to assist in determining whether the employer has met certain participation rates of employees participating in the group health insurance plan. *Id.* at 34-35; 55-57.

22. Defendant Elk and its insurance broker therefore knew Defendant Elk had to cover all its active full-time employees (or obtain a waiver of insurance for eligible employees), or Defendant Elk would violate the law.

23. Stynchula, Herbert & Associates provided the Waiver of Enrollment Form to Defendant Elk. *See id.* at 55-57.

24. On April 18, 2007, Claudia Shellnutt called Ms. Porter at work and asked that Ms. Porter sign the "Waiver of Enrollment Form," which Ms. Shellnutt faxed to Ms. Porter shortly after their phone call. (Trial testimony of Porter 6/14/10; Plaintiff's Ex. 7).

25. During the April 18, 2007 phone call with Ms. Shellnutt, Ms. Porter stated she would not sign the waiver form. *Id.*

26. If Ms. Porter had signed the waiver of enrollment form, she would not have received the health insurance benefits that were to be provided all other employees. *Id.*

27. Ms. Porter initially did not sign the waiver of enrollment form because she neither had seen the group health insurance policy nor had a clear explanation of what would happen if she signed it, and she was concerned that she would not be able to get the same insurance at the same price at a later date if she signed the form. (Trial testimony of Porter 6/14/10).

28. The waiver of insurance form also clearly states that "**coverage through an individual policy is not considered a valid reason for waiver.**" Plaintiff's Ex. 7 (emphasis in original).

29. On April 18, 2007, the same day that Ms. Shellnutt faxed the "Waiver of Enrollment Form" to Ms. Porter and was informed that Ms. Porter would not sign it, Defendant Elk faxed the wage and tax report portion of the application (the VEC report) to Stynchula, Herbert & Associates. Ex. 19 at pp. 36-41. Defendant Elk falsely indicated on the wage and tax reporting forms that Ms. Porter already had been terminated. *Id.* and Ex. B to deposition.

30. That same day, on April 18, 2007, Ms. Shellnutt also wrote a check on her and Tim Shellnutt's personal checking account to pay the initial insurance premium for the BlueCross BlueShield group health insurance policy. Plaintiff's Ex. 27.

31. On April 19, 2007, Defendant Elk's insurance broker submitted Defendant Elk's wage and tax form to BlueCross BlueShield without altering it, knowing that BlueCross BlueShield would rely on the information in making its insurance decision. *See* Plaintiff's Ex. 19 at pp. 36-41; Plaintiff's Ex. 27 (showing fax header on VEC report of April 19, 2007).

7

32. BlueCross BlueShield approved the group health insurance policy for Defendant Elk on April 19, 2007. Plaintiff's Ex. 27.

33. A group health insurance plan was in fact established and maintained by Defendant Elk as of April 19, 2007. *See* Plaintiff's Ex. 27.

34. After being asked by Claudia Shellnutt to sign the waiver of enrollment form, Ms. Porter later protested to Tim Shellnutt that the demand that she sign the waiver form was unfair and improper. (*See* Doc. 2, ¶24; Doc. 81; Trial Testimony of Sandra M. Porter and Plaintiff's Exs. 1-3).

35. Timothy Shellnutt claimed that placing Ms. Porter on the group health insurance policy "up front" was too expensive because she was female, she "can get pregnant," and she had a child. (Doc. 2 ¶25; Doc. 81; Plaintiff's Ex. 1-3).[3]

36. Ms. Porter refused to sign the insurance waiver as demanded by Mr. Shellnutt. (Doc. 2 ¶26; Doc. 81; Plaintiff's Ex. 1-3).

37. Mr. Shellnutt stated to Ms. Porter that if Ms. Porter did not sign the waiver, then all other employees would not receive health insurance. (Doc. 2 ¶27; Doc. 81; Plaintiff's Ex. 1-3).

38. Mr. Shellnutt also stated that if Ms. Porter did not sign the insurance waiver form, then she would not receive reimbursement for her individual health insurance premiums that Elk Remodeling, Inc. and Mr. Shellnutt had previously provided Ms. Porter during her employment. (Doc. 2 ¶28; Doc. 81; Plaintiff's Ex. 1-3).

39. After Ms. Porter refused to sign the insurance waiver form, Mr. Shellnutt terminated her employment. (Doc. 2 ¶29; Doc. 81; Plaintiff's Ex. 1-3).

---

[3] The full conversations as recorded on the tape introduced into evidence (Plaintiff's Exs. 1-3) is referenced more fully in Defendant's motion for summary judgment and Plaintiff's opposition to summary judgment and those transcripts are incorporated herein.

40. The termination of Ms. Porter's employment would not have occurred but for Ms. Porter's gender. (*See* Doc. 2 ¶30; Doc. 81; Plaintiff's Ex. 1-3).

41. The termination of Ms. Porter's employment was motivated by her refusal to sign the insurance waiver form, which was not asked of male employees. (Doc. 2 ¶31; Doc. 81; Plaintiff's Ex. 1-3).

42. The termination of Ms. Porter's employment was carried out with the intent to harm her and the purpose of preventing Ms. Porter from attaining health insurance benefits to which she would have been entitled. (Doc. 2 ¶32; Doc. 81; Plaintiff's Ex. 1-3).

43. The termination of Ms. Porter's employment in these circumstances violated ERISA and the Virginia Human Right Act. (Doc. 2 ¶33; Doc. 81; Plaintiff's Ex. 1-3).

44. Defendant Elk, via its officer and agent Tim Shellnutt and agent Claudia Shellnutt, acted with malice in terminating Ms. Porter's employment and intended to cause her harm and to interfere with her attainment of rights to which she would have been entitled under the group health insurance plan. (*See* Doc. 2 ¶62; Doc. 81; Plaintiff's Ex. 1-3).

45. As supported by the evidence, including the tape recording, Defendant Elk, via its officer and agent Tim Shellnutt and agent Claudia Shellnutt, knew exactly what they were doing and what they wanted to accomplish by terminating Ms. Porter's employment — they intended to harm Ms. Porter by terminating her employment so that she could not stand as an obstacle to Defendant Elk obtaining the group health insurance premiums (which were largely for the personal benefit of the Shellnutts) and to prevent Ms. Porter from obtaining those benefits. (*See* Doc. 2 ¶62; Doc. 81; Plaintiff's Ex. 1-3 (referencing Claudia Shellnutt asking Porter to sign waiver form and then the termination of Porter's employment after she would not sign the waiver form to prevent her from obtaining the group health insurance benefits)).

46. Ms. Porter presented evidence of her periods of unemployment as a result of Defendant's intentional harm, her significant efforts to secure alternative employment, as well the difference in pay from her subsequent jobs and her pay as a General Manager at Defendant Elk.

47. Not taking a deduction for unemployment benefits received by Ms. Porter, Ms. Porter's claimed a total of $42,095.90 in back pay. Defendant did not dispute this amount at trial.

## Conclusions of Law

Defendant Elk has conceded liability on Counts III and IV, and the evidence of record supports that, in fact, Defendant Elk and its agents, the Shellnutts, violated ERISA Section 510 and the VHRA in intentionally and maliciously harming Ms. Porter by terminating her employment in violation of law.

### Back Pay

Back pay is an equitable remedy. *Troy v. City of Hampton*, 756 F.2d 1000, 1002 (4th Cir. 1985) (Title VII case). Back pay is an appropriate remedy in ERISA Section 510 claims, which are enforced pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). *See Hemelt v. United States*, 122 F.3d 204, 210 (4th Cir. 1997) (holding payments made pursuant to settlement of Section 510 claims were equitable back pay "wages" and subject to taxation as such); *see also Schwartz v. Gregori*, 45 F.3d 1017, 1022-23 (6th Cir. 1995) (back pay constitutes restitution, which is an equitable remedy available under Section 502(a)(3)). The Court therefore will consider the amount of back pay due Ms. Porter for the Defendant Elk's admitted violation of Section 510.

Unemployment benefits should not be deducted from back pay awards. *See Labor Board v. Gullett Gin Co.*, 340 U.S. 361, 364-65 (1951) (unemployment compensation benefits not deducted from back pay award under NLRA); *EEOC v. Ford Motor Co.*, 645 F.2d 183, 196 (4th Cir. 1981) (holding that unemployment benefits should not be deducted from awards of back pay under Title VII), *rev'd on other grounds*, 458 U.S. 219 (1982); *Donovan v. Schoolhouse Four, Inc.*, 573 F. Supp. 185 (W.D. Va. 1983) (holding in FLSA case that the "award will not be reduced by the amount of unemployment compensation received by some of the employees. Such benefits are collateral benefits and are awarded by the state in furtherance of a separate social policy.") (citing *Ford*); *Mendaloff v. Weiner*, 109 L.R.R.M. 2166 (D. Md. 1981) (preventing deduction of unemployment benefits from back pay awards under Veteran's Re-Employment Rights Act).

Virginia state law is the same. *See Acordia of Va. Ins. Agency v. Genito Glenn, L.P.*, 263 Va. 377, 560 S.E.2d 246, 251 (Va. 2002) ("If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers.") (quoting RESTATEMENT (SECOND) OF TORTS § 920A cmt. b (1979)). The Virginia Supreme Court has recognized that the collateral source rule covers benefits provided by operation of law, including such as social security, unemployment and worker's compensation benefits. *See Acordia*, 560 S.E.2d at 251 (quoting *Schickling v. Aspinall*, 235 Va. 472, 369 S.E.2d 172, 174 (Va. 1988)).

Accordingly, the Court will not deduct Ms. Porter's unemployment benefits from her back pay award. Ms. Porter is entitled to, and the Court hereby awards Ms. Porter $42,095.90 in back pay pursuant to 29 U.S.C. § 1132(a)(3).[4]

Compensatory Damages

The Supreme Court has held that plaintiffs cannot recover for extracontractual damages under ERISA Section 502(a). *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985); *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993). Following the precedent set by the Supreme Court, the Fourth Circuit has itself made clear that a plaintiff cannot receive compensatory damages under ERISA. *E.g., Darcangelo v. Verizon Commc'ns., Inc.*, 292 F.3d 181, 195 (4th Cir. 2002) ("Of course, [Section] 502 limits a plaintiff to equitable relief, so [plaintiff] is not entitled to compensatory . . . damages on the contract claim.); *Griggs v. E.I. Dupont*, 237 F.3d 371, 384 (4th Cir. 2001) ("The phrase 'appropriate equitable relief' encompasses 'those categories of relief that were *typically* available in equity (such as injunction, mandamus, restitution, but not compensatory damages)'" (quoting *Mertens*, 508 U.S. at 255)).[5] Similarly, the Fourth Circuit has held that plaintiffs cannot recover punitive damages under Section 502(a) either. *E.g., Darcangelo*, 292 F.3d at 195. As such, Ms. Porter is not entitled to compensatory or punitive damages under ERISA.

Ms. Porter is also not entitled to compensatory or punitive damages under the VHRA as both are unavailable under the statute. Va. Code § 2.2-2639(C).

---

[4] Ms. Porter is also entitled to back pay under the VHRA for the harm intentionally inflicted by Defendant Elk and its officer and agents, but the Court understands from trial that she is not seeking a double recovery.
[5] The Court understands that some district courts in the country have suggested that plaintiffs are entitled to compensatory damages under ERISA; however, as is clearly laid out by the Court, such is not the law in the Fourth Circuit.

12

### Prejudgment and Post-Judgment Interest

"ERISA does not specifically provide for pre-judgment interest, and absent a statutory mandate the award of pre-judgment interest is discretionary with the trial court." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030 (4th Cir. 1993) (en banc). The Court finds this a particularly appropriate case in which to award prejudgment interest given the facts recited previously herein and hereby awards prejudgment interest, as in *Quesinberry*, according to the Virginia judgment rate in Va. Code § 6.1-330.54, which is 6% per annum. This yields $7,893.00 in prejudgment interest ($42,095.90 x .06=$2,525.75 yearly interest, which is equivalent to $210.48 per month. $210.48 x 37.5 months (April 27, 2007 to date of judgment) = $7,893.00). Thus, judgment will enter in favor of Ms. Porter and against Defendant Elk in the amount of $49,988.90.

Post-judgment interest on the $49,988.90 judgment shall be in accordance with 28 U.S.C. § 1961. *See Quesinberry*, 987 F.2d at 1031 (mandating use of post-judgment interest in ERISA cases in accordance with 28 U.S.C. § 1961 on entire amount of judgment).

### Attorney's Fees and Costs

Plaintiff also has achieved "some degree of success on the merits" of her claim and therefore is eligible for reasonable attorney's fees and costs. *See Hardt v. Reliance Standard Life Ins. Co.*, --- U.S. ---, 2010 U.S. LEXIS 4164 (2010). Indeed, Plaintiff here meets the higher standard of a prevailing party. (Plaintiff also is entitled to attorney's fees on her VHRA claim, though such fees are limited. *See* Va. Code §2.2-2639(C). However, ERISA's attorney fee and cost provision contains no such limitation. *See* 29 U.S.C. § 1132(g)(1).)

Plaintiff shall file her motion for attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1) in accordance with the federal rules of civil procedure and reasonably segregate the fees to be awarded pursuant to this order from the fees awarded as a sanction on June 11, 2010.

**Conclusion**

For the foregoing reasons, the Court hereby awards Ms. Porter $42,095.90.

Alexandria, Virginia
July 1, 2010

/s/ —————
Liam O'Grady
United States District Judge